UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

EARL LEE DOREY,

     Plaintiff,

v.                                Case No. 5:22-cv-657-WFJ-PRL

HANS HARTMANN, HECTOR
OTERO, JOSEPH KATICH,
WILLIAM O. FARMER, JR.,

     Defendants.

_____/

## ORDER

    This matter comes before the Court on Defendants' motion for summary judgment. (Doc. 37). Plaintiff Earl Lee Dorey, proceeding *pro se*, opposes the motion.[1] (Docs. 42, 46). After careful consideration, the Court grants Defendants' motion for summary judgment.

## I.    FACTUAL BACKGROUND

    On the evening of September 26, 2019, the Sumter County Sheriff's Office received a tip that a criminal suspect named Ian King could be found at a residence in Oxford, Florida. (Doc. 37 at 3; Doc. 42 at 1). Deputy Hector Otero and Deputy Hans

---

[1] Although Mr. Dorey asks the Court to grant him summary judgment in his filing titled "Defendants['] motion for summary judgment oppose," he also states that "this case needs to go to trial." (Doc. 42 at 1). In another filing titled "declaration in opposition to [D]efendants['] motion for summary judgment," Mr. Dorey states that there are "genuine issue[s] of material fact." (Doc. 46 at 3–5). Therefore, Mr. Dorey's filing (Doc. 42) is liberally construed as a response in opposition to Defendants' motion for summary judgment rather than as a motion for summary judgment.

Hartmann of the Sumter County Sheriff's Office arrived at the residence around 11 p.m. (Doc. 37 at 3; Doc. 42 at 1). Sergeant Joseph Katich was also in the area looking for Mr. King. (Doc. 37 at 3).

Upon their arrival, Deputy Otero and Deputy Hartmann entered through the residence's open front driveway gate to ask the occupants about Mr. King. (Doc. 37 at 3–4). The deputies were dressed in full uniform, and their marked patrol vehicle was parked on the street. (Doc. 37 at 4). As the deputies walked up the long driveway toward the residence, Mr. Dorey sat in his parked car in the driveway near the residence. (Doc. 1 at 5; Doc. 37 at 4; Doc. 38-5 at 0:01–0:03). The parties disagree about what happened next.

In his complaint, Mr. Dorey alleges that when the deputies entered the driveway, they snuck up on him unexpectedly and banged on his car with their flashlights. (Doc. 1 at 5; Doc. 42 at 2). At this point, Mr. Dorey did not realize the deputies were law enforcement officers. (Doc. 1 at 5). The deputies startled Mr. Dorey, and consequently, he began to reverse his car and then pulled forward. (Doc. 1 at 5). In his response to Defendants' motion, Mr. Dorey makes the same allegations but excludes the part of the story during which he reverses his car and instead seems to assert that he did not move his car at all. (Doc. 42 at 2). Mr. Dorey denies hitting anyone with his car. (Doc. 42 at 2).

Mr. Dorey further claims that once he realized the deputies were law enforcement officers, he put his hands out of the driver-side window "in a peaceful move." (Doc. 1 at 5; Doc. 42 at 2). Deputy Hartmann told Mr. Dorey he was under

arrest for hitting a deputy with his car. (Doc. 42 at 2). Deputy Hartmann then opened the car door, grabbed Mr. Dorey's arm, pulled Mr. Dorey to the ground, hit Mr. Dorey with a flashlight, punched Mr. Dorey in the face "7 to 10 times until blood squirted out [of his] eye," and put his knee in Mr. Dorey's neck. (Doc. 1 at 6; Doc. 46 at 2). Mr. Dorey denies punching, slapping, or kicking Deputy Hartmann. (Doc. 1 at 6; Doc. 46 at 2). While this incident was happening, Mr. Dorey's pregnant girlfriend, Katie Bell, ran from the residence toward Deputy Hartmann and Mr. Dorey. (Doc. 1 at 6; Doc. 46 at 2). Deputy Otero tased Miss Bell. (Doc. 1 at 6; Doc. 46 at 2). Mr. Dorey laid on the ground yelling, "she's pregnant" when Deputy Otero kicked Mr. Dorey in the ribs. (Doc. 1 at 6; Doc. 46 at 2).

Defendants offer a different version of events. When the deputies walked up the driveway toward the residence, Mr. Dorey backed his car toward them. (Doc. 37 at 4). The deputies flashed their flashlights at Mr. Dorey, and he stopped. (Doc. 37 at 4). The deputies could see the driver was a thin, white, brown-haired male in his thirties and thus matched Mr. King's description. (Doc. 37 at 4). Mr. Dorey pulled his car forward, and the deputies shouted: "STOP! SHERIFF'S OFFICE!" and followed the car on foot. (Doc. 37 at 4–5). Mr. Dorey pulled forward off the driveway and into the yard but was trapped by a fence. (Doc. 37 at 5). When the deputies surrounded the car, Mr. Dorey reversed into Deputy Hartmann, striking his right leg. (Doc. 37 at 5). The deputies drew their firearms, and Deputy Otero repeatedly struck the passenger window with his flashlight, causing Mr. Dorey to stop fleeing. (Doc. 37 at 5–6).

Mr. Dorey rolled down his window, and the deputies could see that he was not Mr. King, but they recognized him as another suspect in seven active felony cases. (Doc. 37 at 6). Mr. Dorey refused Deputy Hartmann's instructions to exit the car. (Doc. 37 at 7). Deputy Hartmann opened the driver-side door and instructed Mr. Dorey to exit the car because he was under arrest, but Mr. Dorey continued to argue with Deputy Hartmann. (Doc. 37 at 7). Deputy Hartmann pulled Mr. Dorey from the car by his arm because he continued to ignore commands to exit the car. (Doc. 37 at 7).

Once Mr. Dorey was on the ground, he refused commands to place his hands behind his back, refused to relax his arms, and physically resisted Deputy Hartmann. (Doc. 37 at 7). As Deputy Hartmann attempted to secure Mr. Dorey, Miss Bell ran out of the residence toward them. (Doc. 37 at 8). Deputy Otero tased Miss Bell, and Mr. Dorey responded by striking Deputy Hartmann. (Doc. 37 at 8). Deputy Hartmann struck Mr. Dorey three times in the head with his hand/fist and discontinued striking Mr. Dorey once he stopped actively resisting. (Doc. 37 at 8–9). Deputy Hartmann held his flashlight in his hand but did not use it to strike Mr. Dorey. (Doc. 37 at 8–9). Deputy Otero delivered a single compliance kick to Mr. Dorey's mid-section to assist with gaining Mr. Dorey's compliance. (Doc. 37 at 9).

Sergeant Katich arrived on foot and verbally commanded Mr. Dorey to stop resisting but did not physically interact with him. (Doc. 37 at 9–10). Mr. Dorey did not comply with commands to put his hands behind his back and continued resisting Deputy Hartmann's attempts to handcuff him. (Doc. 37 at 10). Deputy Hartmann

4

struck Dorey a fourth time with his fist. (Doc. 37 at 10). Dorey rolled on his stomach, and Deputy Hartmann finally secured his hands behind his back. (Doc. 37 at 10). After securing Mr. Dorey, the deputies did not apply any more force. (Doc. 37 at 10).

Defendants submitted a surveillance video without audio in support of their motion for summary judgment that depicts the events at issue. (Doc. 38-5). The video began when the deputies entered the driveway as Mr. Dorey sat in his car. (Doc. 38-5 at 0:01–0:03). It is not clear from the video whether Mr. Dorey saw anyone walking toward him, but he began backing down the long driveway toward the deputies, who responded by flashing their flashlights at the car. (Doc. 38-5 at 0:02–0:12). Mr. Dorey stopped short of the deputies and then pulled forward to the beginning of the driveway, where he veered right into the grass and trapped himself. (Doc. 38-5 at 0:10–0:21).

The deputies ran toward the car, and Deputy Hartmann placed his hands on the trunk. (Doc. 38-5 at 0:13–0:21). Mr. Dorey reversed into Deputy Hartmann, striking his right leg, but then stopped as Deputy Hartmann maneuvered from the driver-side to the rear of the vehicle, placing his hands on the trunk. (Doc. 38-5 at 0:19–0:22). Simultaneously, Deputy Otero repeatedly hit the passenger side of the car with his flashlight. (Doc. 38-5 at 0:20–0:24). Mr. Dorey rolled down his window and put his hands up but kept them inside the car. (Doc. 38-5 at 0:22–0:26). It appears that Mr. Dorey and Deputy Hartmann were exchanging words. (Doc. 38-5 at 0:22–0:26). Deputy Hartmann opened the driver-side door, and the two continued to exchange words while Mr. Dorey remained in the car. (Doc. 38-5 at 0:26–0:29). Deputy

5

Hartmann then pulled Mr. Dorey out of the car by grabbing his arm. (Doc. 38-5 at 0:29–0:32).

Immediately after Deputy Hartmann brought Mr. Dorey to the ground, Miss Bell ran out of the residence toward them. (Doc. 38-5 at 0:33–0:34). Deputy Otero moved off to the side before tasing Miss Bell. (Doc. 38-5 at 0:34–0:36). Miss Bell fell to the open driver-side door, where she remained until additional officers arrived. (Doc. 38-5 at 0:35–5:16). At this point, Mr. Dorey hit and kicked Deputy Hartmann as he and attempted to squirm away and Deputy Hartmann attempted to bring his hands together to handcuff him. (Doc. 38-5 at 0:35–0:43). In response, Deputy Hartmann struck Mr. Dorey with his right hand, in which he was holding his flashlight,[2] and placed his knee on Mr. Dorey's stomach. (Doc. 38-5 at 0:36–0:39). Deputy Otero shined his flashlight at Mr. Dorey during the struggle and delivered a single, short kick to Mr. Dorey's left side. (Doc. 38-5 at 0:38–0:45). At this point, Deputy Hartmann subdued Mr. Dorey but was still unable to handcuff him, and Sergeant Katich ran up the driveway toward them. (Doc. 38-5 at 0:39–0:48).

Mr. Dorey began to struggle again, and Deputy Hartmann struck Mr. Dorey, which subdued him. (Doc. 38-5 at 0:50–0:53). Deputy Hartmann moved Mr. Dorey onto his back with his right arm behind him, but Mr. Dorey's left arm remained under his body and out of Deputy Hartmann's reach. (Doc. 38-5 at 0:56–1:18). Finally, Deputy Hartmann secured Mr. Dorey's arms and handcuffed him. (Doc. 38-5 at 1:18–

---

[2] It is not clear whether Deputy Hartmann used his fist or the flashlight to hit Mr. Dorey because of the poor lighting.

1:30). Deputy Hartmann ceased physical contact and stood over Mr. Dorey while Deputy Otero and Sergeant Katich looked around the car. (Doc. 38-5 at 1:30–2:04).

Sergeant Katich, Deputy Otero, and Deputy Hartmann each submitted an affidavit in support of the motion for summary judgment. (Docs. 38-1, 38-2, 38-3). In their affidavits, Deputy Otero and Deputy Hartmann consistently attest that: (1) when Mr. Dorey first backed his car toward them, they shouted "STOP" and "Sheriff's Office" before pursuing his car on foot; (2) when they reached the car, Mr. Dorey reversed into Deputy Hartmann; (3) Mr. Dorey did not stop trying to flee until Deputy Otero showed Mr. Dorey his gun; (4) they believed Mr. Dorey was Mr. King when the encounter first began, but once they saw his face they recognized him as Mr. Dorey; (5) rather than exit the car, Mr. Dorey rolled down his window and argued with Deputy Hartmann; (6) even after Deputy Hartmann opened Mr. Dorey's car door, Mr. Dorey continued to argue with him rather than exit the car; (7) after Deputy Hartmann pulled Mr. Dorey to the ground he tensed his arms and refused to comply with their commands; (8) Mr. Dorey fought harder after Deputy Otero tased Miss Bell; (9) in response to Mr. Dorey's resistance, Deputy Otero delivered a single compliance kick to Mr. Dorey's midsection; (10) Sergeant Katich arrived during the struggle and did not use any force against Mr. Dorey; and (11) Deputy Hartman delivered a total of four compliance strikes during the encounter. (Doc. 38-2 at 1–4; Doc. 38-3 at 1–4).

In his affidavit, Sergeant Katich similarly attests that, although he did not see most of the events, he arrived as Deputy Hartmann struggled to secure Mr. Dorey who did not follow commands to stop resisting. (Doc. 38-1 at 2). Sergeant Katich did not

see any of the compliance strikes that Deputy Hartmann administered and he did not personally use any force against Mr. Dorey. (Doc. 38-1 at 2). Sergeant Katich also attests that he knew Mr. Dorey as a suspect in other cases. (Doc. 38-1 at 2).

It is undisputed that the deputies called emergency medical services to the scene, and they took Mr. Dorey to the Villages Regional Hospital. (Doc. 1 at 6; Doc. 37 at 10). It is undisputed that Mr. Dorey incurred a scalp laceration during the incident. (Doc. 37 at 10; Doc. 46 at 4, 15). Mr. Dorey also claims in his complaint that he suffered from broken ribs, a torn rotator cuff, and an injury to his eye socket that required seven staples. (Doc. 1 at 5). Defendants provide an imaging report from the Villages Regional Hospital. (Doc. 38-6). The imaging report demonstrates an acute nondisplaced fracture to one of Mr. Dorey's ribs, healing fractures on the ninth and tenth rib, and no acute findings on the upper abdomen. (Doc. 38-6). The imaging report does not mention the rotator cuff or eye injury. Neither Defendants nor Mr. Dorey provide any other medical evidence.

The deputies arrested Mr. Dorey and charged him with aggravated battery of an officer (Count I),[3] resisting an officer with violence (Count II), and possession of paraphernalia (Count III). (Doc. 20-1 at 1). Mr. Dorey pleaded guilty/nolo contendere to Count I and Count II, and the State dismissed Count III. (Doc. 20-1 at 1). Mr. Dorey was sentenced to 50-months' imprisonment. (Doc. 20-1 at 5).

---

[3] Ultimately, the State Attorney charged Mr. Dorey with battery for striking Deputy Hartmann while resisting arrest, not for hitting Deputy Hartmann with his car. (Doc. 37 at 8 n.7).

## II.    PROCEDURAL BACKGROUND

Mr. Dorey initiated this suit under 42 U.S.C. Section 1983 against the Sumter County Sheriff's Office, Sergeant Katich, Deputy Otero, and Deputy Hartman in their individual and official capacities asserting claims of excessive force, wrongful arrest, and malicious prosecution. (Doc. 1 at 2–4). Defendants partially moved to dismiss. (Doc. 20). The Court granted Defendants' motion, dismissed the Sumter County Sheriff's Office, and substituted Sumter County Sheriff William Farmer in his official capacity. (Doc. 30). The Court also dismissed Mr. Dorey's claims against Sergeant Katich, Deputy Otero, and Deputy Hartman in their official capacities, and dismissed Mr. Dorey's wrongful arrest and malicious prosecution claims. (Doc. 30). Mr. Dorey's claim of excessive force against Sergeant Katich, Deputy Otero, and Deputy Hartman in their individual capacities, and Sheriff Farmer in his official capacity, are all that remain. Defendants move for summary judgment on these claims based on qualified immunity. (Doc. 37).

## III.    LEGAL STANDARDS

### a.    Summary Judgment

On a motion for summary judgment, a court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). As such, summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together

9

with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)).

The moving party bears the initial burden of stating the basis for its motion and citing portions of the record demonstrating the absence of genuine issues of material fact. *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004) (quoting *Celotex*, 477 U.S. at 323). That burden is discharged if the moving party can show that there is "an absence of evidence to support the nonmoving party's case." *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437–38 (11th Cir. 1991) (quoting *Celotex*, 477 U.S. at 324). If the moving party discharges its burden, the nonmoving party must identify specific facts showing that there is a genuine issue of material fact. *Four Parcels of Real Property*, 941 F.2d at 1437–38 (citing Fed. R. Civ. P. 56(e)).

An issue is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party. *Allen*, 121 F.3d at 646 (quoting *Anderson*, 477 U.S. at 248). A fact is "material" if it might affect the outcome of the case. *Id.* When determining whether a genuine issue of material fact exists, the court must consider all the evidence in the light most favorable to the nonmoving party. *Celotex*, 477 U.S. at 323. Ultimately, summary judgment should be granted against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322.

b.    **Section 1983**

"[S]ection 1983 provides a method for vindicating federal rights conferred by the Constitution and federal statutes." *Bannum, Inc. v. City of Fort Lauderdale*, 901 F.2d 989, 997 (11th Cir. 1990) (citations omitted). To successfully plead a Section 1983 claim, a plaintiff must allege: "(1) that [an] act or omission deprived [them] of a right, privilege or immunity secured by the Constitution or laws of the United States, and (2) that the act or omission was done by a person acting under color of law." *Id.*; *see also Knight v. Jacobson*, 300 F.3d 1272, 1276 (11th Cir. 2002).

c.    **Qualified Immunity and the Fourth Amendment**

"Qualified immunity shields public officials from liability for civil damages when their conduct does not violate a constitutional right that was clearly established at the time of the challenged action." *Bailey v. Wheeler*, 843 F.3d 473, 480 (11th Cir. 2016) (citations omitted). A defendant seeking to invoke qualified immunity bears the initial burden of demonstrating that they were acting within the scope of their discretionary authority when the alleged wrongful conduct occurred. *Id.* (citations omitted). The burden then shifts to the plaintiff to demonstrate that qualified immunity does not apply by showing that the defendant's conduct violated a constitutional right that was clearly established at the time it occurred. *Id.* (citations omitted).

"Discretionary authority includes all acts of a governmental official that were (1) undertaken pursuant to the performance of his duties and (2) within the scope of his authority." *Howell v. City of Lithonia*, 397 F. App'x 618, 620 (11th Cir. 2010) (citing

*Jordan v. Doe*, 38 F.3d 1559, 1566 (11th Cir. 1994)). "Because making an arrest is within the official responsibilities of a sheriff's deputy," Sergeant Katich, Deputy Otero, and Deputy Hartmann were "performing a discretionary function when [they] arrested" Mr. Dorey. *See Crosby v. Monroe Cnty.*, 394 F.3d 1328, 1332 (11th Cir. 2004); *Howell*, 397 F. App'x at 620 ("[M]aking an arrest clearly fell within the scope of [the defendant's] authority as a police officer."); *Shepard v. Davis*, 300 F. App'x 832, 837 (11th Cir. 2008) (holding that the defendant "was acting within his discretionary authority" where the plaintiff's "'suit [arose] out of [the defendant's] decision to arrest [the plaintiff]'"); *Townsend v. Coffee Cnty.*, 854 F. Supp. 2d 1345, 1356 (S.D. Ga. 2011) ("Carrying out an investigatory stop and making an arrest are quintessentially discretionary acts of law-enforcement officials." (citations omitted)).

When a plaintiff asserts a claim of excessive force during an arrest, the determination of whether the defendant violated their constitutional right "is governed by the Fourth Amendment's objective reasonableness standard." *See Baker v. City of Madison*, 67 F.4th 1268, 1279 (11th Cir. 2023) (citations omitted); *Graham v. Connor*, 490 U.S. 386, 394 (1989) (ruling that when an "excessive force claim arises in the context of an arrest or investigatory stop of a free citizen," the claim is analyzed under the Fourth Amendment). It is well established that "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 394 (citing *Jackson v. Sauls*, 206 F.3d 1156, 1169–70 (11th Cir. 2000)). But "the amount of force used by an officer in seizing and arresting a suspect 'must be reasonably proportionate to the need for

12

that force.'" *Stephens v. DeGiovanni*, 852 F.3d 1298, 1324 (11th Cir. 2017) (citations omitted); *see also Hadley v. Gutierrez*, 526 F.3d 1324, 1330 (11th Cir. 2008) ("[E]xcessive force is judged solely on an objective basis." (citations omitted)).

The reasonableness inquiry is conducted on a case-by-case basis from the perspective of a reasonable official "in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation[,]" and without "the 20/20 vision of hindsight." *Graham*, 490 U.S. at 397; *Johnson v. City of Miami Beach*, 18 F.4th 1267, 1272 (11th Cir. 2021) (quoting *Brown v. City of Huntsville*, 608 F.3d 724, 738 (11th Cir. 2010)); *Tillis ex rel. Wuenschel v. Brown*, 12 F.4th 1291, 1298 (11th Cir. 2021). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving . . . ." *Graham*, 490 U.S. at 396–97. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights[.]" *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2nd Cir. 1973)).

In applying the Fourth Amendment objective reasonableness standard, courts conduct a totality of the circumstances test considering: (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," (3) "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight," (4) "the need for the application of force," (5) "the relationship between the need and amount of force used," and (6) "the extent of the injury inflicted." *Mobley v. Palm Beach Cnty. Sheriff Dep't*, 783 F.3d 1347, 1353 (11th

Cir. 2015) (first quoting *Graham*, 490 U.S. at 396; and then quoting *Lee v. Ferraro*, 284 F.3d 1188, 1198 (11th Cir. 2002)).

A plaintiff can demonstrate that his constitutional right was clearly established in three ways. *Loftus v. Clark-Moore*, 690 F.3d 1200, 1204 (11th Cir. 2012) (citations omitted). First, he may show that a "materially similar case has already been decided," in which the judicial precedent is "tied to particularized facts." *Id.* (quotations omitted) (citations omitted). This inquiry considers whether "the factual scenario that the official faced is fairly distinguishable from the circumstances facing a governmental official in a previous case." *Id.* (quotations omitted) (citations omitted). Second, the plaintiff "may point to a broader, clearly established principle [that] should control the novel facts [of his] situation." *Id.* (quotations omitted) (citations omitted). Under this prong, "the principle must be established with obvious clarity by the caselaw so that every objectively reasonable government official facing the circumstances would know that [their] conduct . . . violat[ed] federal law when [they] acted." *Id.* at 1205 (quotations omitted) (citations omitted). Third, the plaintiff's claim may fall within a "narrow" category of "situations where the official's conduct lies so obviously at the very core of what the [relevant constitutional provision prohibits] that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of case law." *Id.* (quotations omitted) (citations omitted).

In all, to determine whether qualified immunity applies, "the salient question . . . is whether the state of the law [at the time] gave [the official] fair warning that their alleged treatment of the [plaintiff] was unconstitutional." *Hope v. Pelzer*, 536 U.S. 730,

741 (2002). Moreover, "if case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant." *Priester v. City of Riviera Beach*, 208 F.3d 919, 926 (11th Cir. 2000) (quotations omitted) (citations omitted). If a court finds that the defendant's conduct did not violate the plaintiff's constitutional right, the inquiry ends, and the court need not inquire into whether the right was clearly established. *See Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1200 (11th Cir. 2007).

## IV.    DISCUSSION

### a.    Official Capacity Claim Against Sheriff William Farmer

Mr. Dorey initially sued the Sumter County Sheriff's Office, but Sheriff Farmer was substituted in its place because Sheriff's Offices are not capable of being sued under Florida law. (Doc. 30 at 4–5). Supervisors, like Sheriff Farmer, cannot be liable under Section 1983 for their employee's actions, but rather, they must have caused the constitutional violation either by personally inflicting the injury or "when execution of a government's policy or custom" was "the moving force of the constitutional violation." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978); *see Myrick v. Fulton Cnty., Ga.*, 69 F.4th 1277, 1297–98 (11th Cir. 2023); *Ireland v. Prummell*, 53 F.4th 1274, 1289 (11th Cir. 2022) ("Liability under [Section] 1983 cannot be based on the theory of vicarious liability." (citation omitted)). A policy or custom may be established by identifying an officially promulgated policy or an unofficial policy shown by a persistent and widespread practice. *McDowell v. Brown*, 392 F.3d 1283, 1290 (11th Cir. 2004).

Mr. Dorey does not allege that Sheriff Farmer used excessive force against him, nor is there anything in the record to indicate that Sheriff Farmer was present when the deputies arrested Mr. Dorey. Mr. Dorey does not allege that a policy or custom was the moving force behind the deputies' alleged use of excessive force against him. Even when liberally construing Mr. Dorey's complaint, the Court cannot infer that Sheriff Farmer or his office's custom or policy caused Mr. Dorey's constitutional injury. *See Church v. City of Huntsville*, 30 F.3d 1332, 1345 (11th Cir. 1994) (ruling that "random acts or isolated incidents" are not enough to establish liability pursuant to a policy, custom, or practice (quotations omitted) (citations omitted)). Therefore, Mr. Dorey fails to state a claim against Sheriff Farmer under Section 1983, and Defendants' motion is **GRANTED** to the extent that Mr. Dorey's claim against Sheriff Farmer is **DISMISSED**.

**b.    Individual Capacity Claim Against Sergeant Joseph Katich**

Mr. Dorey sues Sergeant Katich for excessive force but does not allege that Sergeant Katich used any force against him. (Doc. 1 at 5–6). Defendants' surveillance video shows Sergeant Katich entering the scene as Deputy Hartmann attempted to handcuff Mr. Dorey. (Doc. 38-5 at 0:44–0:47). The video demonstrates that Sergeant Katich did not physically interact with Mr. Dorey in any way, let alone use excessive force against him. (Doc. 38-5 at 0:44–1:18). In addition, Sergeant Katich, Deputy Otero, and Deputy Hartmann's affidavits all state that Sergeant Katich did not use any force against Mr. Dorey. (Doc. 38-1 at 2; Doc. 38-2 at 5; Doc. 38-3 at 4). Therefore, there is no dispute of material fact regarding whether Sergeant Katich used excessive

16

force against Mr. Dorey. *See Celotex*, 477 U.S. at 323. Because Mr. Dorey does not demonstrate that Sergeant Katich violated his constitutional right, Sergeant Katich is entitled to qualified immunity. *See Irvin*, 496 F.3d at 1200 ("If the official did not violate the law, the inquiry ends." (citation omitted)). Defendants' motion is **GRANTED** to the extent that Mr. Dorey's claim against Sergeant Katich is **DISMISSED**.

c.    **Individual Capacity Claims Against Deputy Hector Otero and Deputy Hans Hartmann**

Mr. Dorey sues Deputy Otero and Deputy Hartmann for using excessive force against him. (Doc. 1 at 4). In their motion, Defendants argue that "the force used in Dorey's lawful arrest was objectively reasonable in the circumstances and . . . did not violate clearly established law." (Doc. 37 at 2). Mr. Dorey asserts that there are multiple issues of material fact[4] but notably does not address Defendants' argument that they are entitled to qualified immunity. (*See* Doc. 42; Doc. 46 at 1–6). Defendants met their burden of establishing that they were acting within their discretionary authority when the incident occurred, and thus, Mr. Dorey must prove that Defendants' conduct violated his clearly established constitutional right. *Bailey*, 843 F.3d at 480. To determine whether the deputies violated Mr. Dorey's constitutional right by using excessive force against him, the Court must consider the totality of the

---

[4] Mr. Dorey asserts five relevant issues of material fact: (1) whether Mr. Dorey hit Deputy Hartmann with his car; (2) whether Mr. Dorey hit or kicked Deputy Hartman; (3) how many times Deputy Hartmann struck Mr. Dorey; (4) whether Deputy Hartmann used a flashlight to strike Mr. Dorey; and (5) whether Mr. Dorey was injured during the incident. (Doc. 42 at 2; Doc. 46 at 3–4).

circumstances and weigh six factors. *Mobley*, 783 F.3d at 1353 (first quoting *Graham*, 490 U.S. at 396; and then quoting *Ferraro*, 284 F.3d at 1198).

The first factor, the severity of the crime, weighs in Defendants' favor. When the deputies used force against Mr. Dorey, they were arresting him for battery on an officer because he hit Deputy Hartmann with his car. (Doc. 37 at 5, 8 n.7; Doc. 20-1 at 5). After Mr. Dorey's vehicle came to a stop and deputies surrounded his car, he reversed into Deputy Hartmann, striking his right leg.[5] (Doc. 42 at 2; Doc. 37 at 5; Doc. 38-5 at 0:11–0:22). "[B]attery on a law enforcement officer and resisting arrest with violence" are "[c]ertainly . . . serious offenses." *Marantes v. Miami-Dade Cnty.*, 776 F. App'x 654, 665 (11th Cir. 2019).

The second factor, whether the suspect poses an immediate threat to the safety of the officers or others, similarly weighs in Defendants' favor. The deputies arrived

---

[5] Mr. Dorey claims that he did not hit Deputy Hartmann with his car and the deputies consequently arrested him without probable cause or a warrant. (Doc. 42 at 2; Doc. 46 at 3). Conversely, Defendants claim that Mr. Dorey hit Deputy Hartmann with his car. (Doc. 37 at 5). Mr. Dorey argues that this presents an issue of material fact requiring submission to the jury. (Doc. 46 at 3). For purposes of this motion, the Court is required to accept as true Mr. Dorey's factual allegations that are not affirmatively contradicted by the record. *See Stephens v. DeGiovanni*, 852 F.3d 1298, 1324 (11th Cir. 2017) (citations omitted); *Baltimore v. City of Albany*, 183 F. App'x 891, 895, 897 (11th Cir. 2006) (ruling that when reviewing a claim of qualified immunity on summary judgment, the court . . . examines the "plaintiff's best case before it," taking all plaintiff's facts as true except what is "affirmatively contradicted" (quoting *Robinson v. Arrugueta*, 415 F.3d 1252, 1257 (11th Cir. 2005)). Mr. Dorey's assertion that he did not hit Deputy Hartmann with his car is affirmatively contradicted by the surveillance video—which shows that, after coming to a stop, Mr. Dorey reversed his car, striking Deputy Hartmann's right leg—and consequently does not present a genuine issue of material fact. (Doc. 38-5 at 0:19–0:22). Further, when Mr. Dorey hit Deputy Hartmann with his car in violation of Florida Statutes Sections 784.03(1)(a) and 784.07(2)(d), the deputies had the authority to detain and arrest him. *See* Fla. Stat. § 901.15 ("A law enforcement officer may arrest a person without a warrant when (1) [t]he person has committed a felony or misdemeanor . . . in the presence of the officer."); *see also Myers v. Bowman*, 713 F.3d 1319, 1326 (11th Cir. 2013) ("Probable cause to arrest exists when . . . the facts and circumstances within the officer's knowledge . . . would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." (quotations omitted) (citations omitted)).

on the scene looking for a suspect with active warrants. (Doc. 37 at 3; Doc. 42 at 1). When the deputies realized that Mr. Dorey was not Mr. King, they recognized him as a suspect in seven active felony cases. (Doc. 37 at 6; Doc. 38-1 at 2; Doc. 38-2 at 3; Doc. 38-3 at 3). While Mr. Dorey was attempting to flee, he struck Deputy Hartmann with his vehicle. (Doc. 42 at 2; Doc. 37 at 5; Doc. 38-5 at 0:11–0:22). Although Mr. Dorey claims he was peaceful during the encounter, he does not deny that he failed to submit to arrest. (Doc. 42 at 3). When Deputy Hartmann removed Mr. Dorey from his car, Mr. Dorey hit and kicked Deputy Hartmann and resisted being handcuffed.[6] (Doc. 37 at 7–9; Doc. 38-5 at 0:33–1:08). Consequently, Mr. Dorey posed an immediate threat to the deputies. *Compare Hoolihan v. Clayton Cnty.*, No. 1:10-CV-01753-SCJ, 2012 WL 12888679, at *6 (N.D. Ga. Mar. 12, 2012), *aff'd*, 507 F. App'x 831 (11th Cir. 2013) (finding that a suspect posed an immediate threat to an officer when he resisted, battered the officer, and refused to comply with commands to stop), *with Acosta v. Miami-Dade Cnty.*, 97 F.4th 1233, 1240 (11th Cir. 2024) (finding that a suspect was not an immediate threat to officers when he was "calm," and "just l[]ying there").

The third factor, whether the suspect resisted or attempted to evade arrest, also weighs in Defendants' favor. Mr. Dorey attempted to flee from the deputies in his car.

---

[6] Mr. Dorey claims that he did not hit or kick Deputy Hartmann and that this issue presents a dispute of material fact. (Doc. 42 at 2). This assertion is affirmatively contradicted by the surveillance video and Mr. Dorey's guilty plea to the charge of battering Deputy Hartmann. (Doc. 20-1 at 1; Doc. 38-5 at 0:35–0:43). Consequently, it does not present an issue of material fact that would defeat Defendants' motion. *See Baltimore*, 183 F. App'x at 895, 897.

(Doc. 37 at 4–5; Doc. 38-5 at 0:11–0:22). Even if Mr. Dorey did not realize who the deputies were before he stopped his vehicle, he continued to resist arrest once their identities were known by not exiting his car, tensing his arms to avoid being handcuffed, and kicking and hitting Deputy Hartmann. (Doc. 37 at 7; Doc. 38-5 at 0:22–1:08). Therefore, Mr. Dorey was attempting to evade arrest.

The fourth and fifth factors, the need for the application of force and the relationship between the need and the force applied, both weigh in Defendants' favor. These determinations are made at the time force is applied. *See Acosta*, 97 F.4th at 1240 (holding that force used against a suspect was excessive when it was applied after the plaintiff was "taken to the ground and subdued and was no longer resisting"). There are three different uses of force at issue in this case.

The first use of force occurred when Deputy Hartmann removed Mr. Dorey from his car. Mr. Dorey claims that once he realized Deputy Hartmann and Deputy Otero were deputies, he "put [his] window down and hands up in a peaceful move[.]" (Doc. 42 at 2). The surveillance video depicts Mr. Dorey rolling down his window and putting his hands up, but also depicts Mr. Dorey and Deputy Hartmann exchanging words immediately after Mr. Dorey put his hands up. (Doc. 38-5 at 0:22–0:29). Defendants and Mr. Dorey seem to agree that Deputy Hartmann instructed Mr. Dorey to exit the car and submit to arrest for battering an officer, but Mr. Dorey did not comply. (Doc. 37 at 7; Doc. 42 at 2).

Because Mr. Dorey did not comply with Deputy Hartmann's instructions to exit the car, Deputy Hartmann reasonably believed force was necessary to remove

Mr. Dorey from his vehicle to effect his arrest and applied a reasonable amount of force to do so. *See Hinson v. Bias*, 927 F.3d 1103, 1120 (11th Cir. 2019) (holding that an officer's takedown of a suspect was reasonable when the suspect repeatedly ignored the officer's "instructions to put his hands up" and "to exit the truck[,]" and was instead moving toward another officer); *Woodruff v. City of Trussville*, 434 F. App'x 852, 855 (11th Cir. 2011) (holding that forcefully removing a suspect from a car, slamming him on the ground, and punching him in the face was de minimis force).

The second use of force occurred when Deputy Otero kicked Mr. Dorey. The surveillance video demonstrates that within a span of fourteen seconds, Mr. Dorey refused to exit his car to submit to arrest, requiring Deputy Hartmann to remove him from the vehicle forcibly; Miss Bell ran toward Deputies Hartmann and Otero, and Deputy Otero tased her; and Mr. Dorey hit and kicked Deputy Hartmann and resisted being handcuffed. (Doc. 46 at 2; Doc. 37 at 5–7; Doc. 38-5 at 0:31–0:45). This series of events ended with Deputy Otero delivering one short and swift kick to Mr. Dorey's ribs to distract him so Deputy Hartmann could handcuff him. (Doc. 1 at 4; Doc. 46 at 2; Doc. 37 at 9; Doc. 38-5 at 0:44–0:45). This was the only time Deputy Otero used any force against Mr. Dorey.

Because Deputy Otero was required to make a split-second judgment in a "tense, uncertain, and rapidly evolving" situation, it was reasonable for Deputy Otero to believe this de minimus use of force was necessary to help control a chaotic situation. *See Myers v. Bowman*, 713 F.3d 1319, 1327 (11th Cir. 2013) ("[T]he application of de minimis force, without more, will not support a claim for excessive

force in violation of the Fourth Amendment." (quotations omitted) (citations omitted)); *Jones v. City of Dothan*, 121 F.3d 1456, 1460–61 (11th Cir. 1997); *see also Nolin v. Isbell*, 207 F.3d 1253, 1257 (11th Cir. 2000).

The third use of force occurred when Deputy Hartmann struck Mr. Dorey while attempting to handcuff him.[7] The surveillance video demonstrates that it took Deputy Hartmann almost a full minute to handcuff Mr. Dorey. (Doc. 38-5 at 0:31–1:30). During this time, Mr. Dorey hit and kicked Deputy Hartmann and squirmed to avoid being handcuffed. (Doc. 37 at 7–10; Doc. 38-5 at 0:35–1:13). Deputy Hartmann did not use force for the first time until Mr. Dorey hit and kicked him. (Doc. 37 at 8–9; Doc. 38-5 at 0:35–0:43). The use of force lasted eight seconds in the surveillance video. (Doc. 38-5 at 0:35–0:43). Deputy Hartmann struck Mr. Dorey again when Mr. Dorey began to squirm and stopped when Mr. Dorey was subdued. (Doc. 37 at 8–9; Doc. 38-5 at 0:50–0:53). This second use of force lasted three seconds in the surveillance video. (Doc. 38-5 at 0:50–0:53).

When Mr. Dorey was not actively resisting using violence, Deputy Hartmann only used force in order to bring Mr. Dorey's hands together to be handcuffed. (Doc. 37 at 10; Doc. 38-5 at 0:43–1:30). It is undisputed that once Mr. Dorey was

---

[7] Mr. Dorey claims there is a dispute of material fact regarding the number of times Deputy Hartmann struck him. (Doc. 42 at 3). Mr. Dorey claims, consistent with the police reports, that Hartmann struck him seven to ten times. (Doc. 1 at 6; Doc. 46 at 3, 12). Defendants claim Deputy Hartmann struck Mr. Dorey four times. (Doc. 37 at 8, 10). Although the surveillance video depicts the incident, it is not clear how many times Deputy Hartmann struck Mr. Dorey because of the video's quality and lighting and the speed of the incident. (Doc. 38-5 at 0:35–1:30). Therefore, there is a dispute of fact that the Court will construe in Mr. Dorey's favor. *See Baltimore*, 183 F. App'x at 895, 897. However, the exact number of strikes is less relevant than whether the strikes were reasonably necessary and proportionate. *See Stephens*, 852 F.3d at 1324.

handcuffed, no more force was applied to him. (Doc. 37 at 10; Doc. 1 at 6; Doc. 42 at 2; Doc. 38-5 at 1:30–2:04). *See Mobley*, 783 F.3d at 1356 ("[T]he point at which a suspect is handcuffed and 'pose[s] no risk of danger to the officer' often is the pivotal point for excessive-force claims." (citations omitted)).

When considering the totality of the circumstances—this arrest occurred at night; Mr. Dorey was a potentially dangerous suspect who the deputies stumbled upon while looking for another potentially dangerous suspect who was purportedly at this residence and could have inserted himself in the situation at any time; Mr. Dorey attempted to flee and physically resisted being handcuffed; and Miss Bell ran at Deputy Hartmann in what appeared to be an attempted attack—Deputy Hartmann reasonably believed it was necessary to strike Mr. Dorey to control the situation; He applied only the force necessary to effectuate that goal. *See Mobley*, 783 F.3d at 1355 (holding that an officer reasonably struck, kicked, and tased a suspect who "struck a police officer with his truck[,] . . . led police on a reckless, high-speed chase," waded into a pond, and refused to surrender his hands despite "escalating force and repeated use of a taser"); *Thomas v. Indian River Cnty. Sheriff's Dep't*, No. 21-CV-14275, 2023 WL 9051420, at *1, 4 (S.D. Fla. Feb. 2, 2023) (holding that an officer reasonably used "several closed hand strikes" during an encounter that lasted one minute when a plaintiff attempted to flee, "repeatedly ignored ongoing commands to stop resisting arrest, reached for his waistband[,] . . . tucked his hands under his torso while on the ground[] to defeat being restrained[,]" and "was immediately taken to a hospital for treatment following his arrest"); *Hoolihan*, 2012 WL 12888679, at *6 (holding that an

23

officer's use of closed-fist face strikes was proportionate to the need for force when the plaintiff punched, grabbed, and kicked the officer, and did not comply with commands to stop); *see also Smith v. City of Huntsville*, No. 5:14-CV-00555-AKK, 2016 WL 5746216, at *9 (N.D. Ala. Sept. 30, 2016) ("[V]iolent resistance to [an] arrest connotes a level of dangerousness that would justify a somewhat greater use of force from the officers to detain him and effectuate [the] arrest." (citations omitted)).

As Mr. Dorey points out, a dispute of fact exists regarding whether Deputy Hartmann used a flashlight to strike him. (Doc. 46 at 3). Mr. Dorey provides a picture of his scalp laceration as proof that Deputy Hartmann used a flashlight to strike him. (Doc. 46 at 15). Mr. Dorey also provides Deputy Hartmann's police report that says, "impact weapon/deployed and used/flashlight" and "I delivered several compliance strikes with my right and left closed fists to [Mr. Dorey's] head . . . [a]s I struck [him] I was clenching my flashlight in my right hand." (Doc. 46 at 8–9). Defendants claim in their motion and affidavits that Deputy Hartmann did not use the flashlight but instead used his hand to strike Mr. Dorey. (Doc. 37 at 8, 10; Doc. 38-2 at 3; Doc. 38-3 at 4). The surveillance video does not affirmatively contradict Mr. Dorey's allegations; although the video depicts Deputy Hartmann holding the flashlight, it does not clearly show whether Deputy Hartmann used the flashlight to strike Mr. Dorey. (Doc. 38-5 at 0:35–0:43, 0:50–0:53). Because the record does not affirmatively contradict Mr. Dorey's claim, the Court reviews Mr. Dorey's best case before it and assumes, for the purpose of ruling on this motion, that Deputy Hartmann

24

struck Mr. Dorey with his flashlight. *See Baltimore v. City of Albany*, 183 F. App'x 891, 895, 897 (11th Cir. 2006).

In hindsight, although it may not have been necessary for Deputy Hartmann to use the flashlight rather than his hand to subdue Mr. Dorey, in examining the totality of the circumstances, it was not excessive. *See Benton v. Hopkins*, 190 F. App'x 856, 860 (11th Cir. 2006) (holding that striking a suspect with a metal baton was not excessive when the suspect did not comply after being pepper sprayed, started "to back away in a manner that a reasonable officer could have construed as an attempt to flee," and landed on top of the officer who tried to tackle him); *Roe v. Fryer*, No. 3:22-CV-971-MMH-LLL, 2024 WL 4581286, at *5, 8 (M.D. Fla. Oct. 25, 2024) (holding that a deputy's striking a suspect in the face with a flashlight was reasonable when the suspect was wanted for beating someone to death, was a reported member of a gang known to carry weapons, led deputies on a high-speed chase until they struck his vehicle, and exited his vehicle and began walking toward a deputy while moving his hand toward his waistband); *Moreland v. Dorsey*, 230 F. Supp. 2d 1338, 1348 (N.D. Ga. 2002) (holding that pepper spraying and striking a suspect on the head with closed fists and a flashlight was not excessive when the suspect fled and actively resisted arrest, and the officers stopped administering force once the plaintiff was subdued and handcuffed). *But see*, *e.g.*, *Hawkins v. Carmean*, 562 F. App'x 740, 743 (11th Cir. 2014) (holding that striking a plaintiff with a flashlight was excessive when the plaintiff was stopped for a tag light violation, there was no indication that she was a threat to safety, she did not attempt to flee, and the officer did not tell her she was under arrest or give

her enough time to comply with a command to exit the car before "reach[ing] into the car, yank[ing her] hair, slapp[ing] her, and hit[ing] her with a flashlight"); *Walker v. City of Riviera Beach*, 212 F. App'x 835, 839 (11th Cir. 2006) (slamming a pistol into a plaintiff's head was unreasonable when an officer pursued the plaintiff for speeding, the plaintiff failed to "immediately pull over" but eventually did, the officer "approached the vehicle on foot with [his] gun drawn[,]" and the plaintiff "turned off the car and did not resist arrest or attempt to flee again").

The sixth factor, the extent of the injury, is the only factor that weighs slightly in Mr. Dorey's favor. Mr. Dorey claims that the deputies caused a scalp laceration, rib injury, a torn rotator cuff, and an eye socket injury that required seven staples. (Doc. 1 at 5; Doc. 37 at 8, 10; Doc. 46 at 15). Mr. Dorey does not allege any long-term or ongoing damage caused by the injuries. Rather than dispute Mr. Dorey's injuries, Defendants argue that the force used against Mr. Dorey was reasonable regardless of his injuries.[8] The Court agrees with Defendants.

"The nature and extent of physical injuries sustained by a plaintiff can be relevant in evaluating" an excessive force claim. *See Hinson*, 927 F.3d at 1117–18 (quotations omitted) (quoting *Stephens*, 852 F.3d at 1325). Nevertheless, "[w]hen more force is required to effect an arrest without endangering officer safety, the suspect will

---

[8] Mr. Dorey claims that Deputy Hartmann caused the scalp laceration when striking him with a flashlight. (Doc. 42 at 2). Conversely, Defendants claim that hitting the ground caused the laceration on Mr. Dorey's scalp. (Doc. 37 at 9 n.8). Mr. Dorey argues that this presents an issue of material fact and should defeat Defendants' motion for summary judgment. (Doc. 46 at 3–4). Regardless of whether the ground or the flashlight caused the injury, Defendants admit that Mr. Dorey incurred the laceration during the incident, and thus, this does not present a dispute of material fact.

likely suffer more severe injury, [and] that alone does not make the use of that amount of force unreasonable." *See Hinson*, 927 F.3d at 1117–18 (quotations omitted) (quoting *Mobley*, 783 F.3d at 1356); *see also Ferraro*, 284 F.3d at 1200 ("[T]he typical arrest involves some force and injury, and the use of force is an expected, necessary part of a law enforcement officer's task of subduing and securing individuals suspected of committing crimes." (quotations omitted) (citations omitted)). Although the laceration is significant, neither it nor Mr. Dorey's other injuries render this use of force unreasonable when Mr. Dorey's resistance caused the injuries. *Compare Fryer*, 2024 WL 4581286, at *8 (finding that this factor was neutral and not greater than necessary when flashlight strikes caused a right orbital fracture, "multiple fractured teeth, and injuries to [the plaintiff's] neck and face"), *with Florence v. City of Lakeland*, No. 8:13-CV-683-T-35-MAP, 2015 WL 8323190, at *10 (M.D. Fla. Dec. 9, 2015) (holding that punching a suspect—who did not flee, resist arrest, or reengage officers after being tased—was excessive force when it caused "fractures to his nose and orbital sockets" requiring four surgeries and causing long-term damage).

All but one of the excessive force factors weigh in Defendants' favor. Even upon a review of Mr. Dorey's "best case," this Court cannot conclude that Mr. Dorey demonstrates a claim of excessive force. *See Mobley*, 783 F.3d at 1355 (holding that force was reasonable when all factors except the extent of the injury weighed in the defendants' favor). Because Mr. Dorey cannot demonstrate a violation of his Fourth Amendment right, Deputy Otero and Deputy Hartmann are entitled to qualified immunity.

Moreover, even if Mr. Dorey met his burden of demonstrating a constitutional violation, his right was not clearly established. It is not clearly established that an officer cannot deliver a single swift compliance kick to, or strike with his fist or flashlight, a suspect who is actively resisting arrest and poses a threat to the officer. In fact, Eleventh Circuit case law suggests the opposite: that an officer is justified in using force in this situation. *See Fryer*, 2024 WL 4581286, at *8; *Moreland*, 230 F. Supp. 2d at 1348; *see also Benton*, 190 F. App'x at 860. While there are circumstances in which an officer may not strike a suspect with a flashlight, this is not one of them. *See Sebastian v. Ortiz*, 918 F.3d 1301, 1311 (11th Cir. 2019) (stating that "case law bars" an officer from beating a suspect who has given up and stopped resisting "with sufficient clarity to put any reasonable officer on notice that this conduct constituted excessive force"); *Hawkins*, 562 F. App'x at 743; *Baltimore*, 183 F. App'x at 893 ("Reasonable officers in [the defendant]'s situation would not have violently struck a misdemeanor suspect, who was being subdued by several officers, in the head with a blunt object to effectuate an arrest for violating the city's open container ordinance.").

Mr. Dorey does not put forth a "materially similar case" or a "broader, clearly established principle" that would give Deputy Otero or Deputy Hartmann a fair warning that their conduct violated his constitutional rights. *See Loftus*, 690 F.3d at 1204. Nor did Deputy Otero or Deputy Hartmann's conduct "lie[] so obviously at the very core of what the" Fourth Amendment prohibits. *See id.*

Accordingly, Deputy Otero and Deputy Hartmann are entitled to qualified immunity. Defendants' motion is **GRANTED** to the extent that Mr. Dorey's claims against Deputy Otero and Deputy Hartmann are **DISMISSED**.

## V.    CONCLUSION

Accordingly, it is hereby

**ORDERED and ADJUDGED**:

1. Defendants' motion for summary judgment (Doc. 37) is **GRANTED**.

2. The Clerk is directed to enter final judgment in Defendants' favor.

3. The Clerk is directed to terminate any pending motions and deadlines and close this case.

**DONE AND ORDERED** in Tampa, Florida, on February 24, 2025.

WILLIAM F. JUNG
UNITED STATES DISTRICT JUDGE

**COPIES FURNISHED TO**:
Counsel of Record
*Pro Se* Party

29